IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

ROYAL D. CLINE,                           )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )          No. 3:04-CV-588
                                          )
BWXT-Y12, L.L.C.,                         )
                                          )
                    Defendant.            )

## MEMORANDUM

This civil action was initiated on November 3, 2004, in the Circuit Court of
Anderson County, Tennessee, and was removed on the basis of diversity jurisdiction [doc.
1].  Now before the court is defendant BWXT-Y12's ("BWXT") motion for summary
judgment [doc. 25].  Plaintiff Royal D. Cline ("Cline") has filed a response [doc. 41], to
which BWXT has submitted a reply [doc. 38].  For the reasons stated herein, defendant's
motion will be granted and this cause will be dismissed.

I.

*Background*

The record and issues in this case are voluminous.  The evidence will be
discussed in greater detail below where relevant.  Highly condensed, the facts are as follows.

Cline was born in 1943.  Since November 2000, BWXT has been the
management and operating contractor of the United States Department of Energy's ("DOE")
Y-12 National Security Complex ("Y-12") in Oak Ridge, Tennessee.  Y-12 is, in part, this

nation's "primary site for enriched uranium processing and storage, and one of the primary manufacturing facilities for maintaining the U.S. nuclear weapons stockpile." *See* Notice of Intent, 70 Fed. Reg. 71271 (Nov. 28, 2005). Y-12 "is used for the fabrication and assembly of nuclear weapons components and for research and development associated with these activities." *Ensor v. Rust Eng'g Co.*, No. 89-5106, 1991 WL 93188, at *1 (6th Cir. June 4, 1991).

According to his resume, Cline has a high school diploma, no college degree, and miscellaneous professional certifications. He worked from 1969 through 1994 for predecessor Y-12 contractors Lockheed Martin Energy Systems ("LMES"), Martin Marietta, and Union Carbide. From 1994 through 2000, he worked at DOE's Oak Ridge National Laboratory ("ORNL"), first for LMES and then for its successor UT-Battelle, LLC.

Cline was laid off by UT-Battelle on December 1, 2000, during a time of post-Cold War budgetary reductions. In late November 2001, he and sixteen other laid off workers filed an age discrimination suit in this court. *See Baker v. UT-Battelle, LLC*, No. 3:01-CV-569. Since his layoff, Cline has expressed interest in a multitude of positions at BWXT but has not been hired.

The present complaint alleges age discrimination and retaliation in violation of the Tennessee Human Rights Act, TENN. CODE ANN. § 4-21-101 *et seq.* (2005) ("THRA"). Cline contends that BWXT wrongfully failed to hire him for almost 100 positions for which he applied between the years 2000 and 2004. BWXT only formally notified him on one

occasion, in November 2004, that he had not been chosen for a particular position. Construing the evidence in the light most favorable to him, Cline was unaware that any other positions had been filled other than a single hiring that occurred in December 2000.

II.

*Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Edwards v. Aguillard*, 482 U.S. 578, 594 (1987) (quoting Fed. R. Civ. P. 56(c)). The movant may discharge its burden by demonstrating that the non-moving party has failed to establish an essential element of that party's case for which it bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party need not support its motion with affidavits or other evidence negating the opponent's claim. *Celotex,* 477 U.S. at 323. Although the moving party has the initial burden, that burden may be discharged by a "showing" to the district court that there is an absence of evidence in support of the non-movant's case. *Id.* at 325.

The burden then shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough."

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat a motion for summary judgment, the non-moving party must present significantly probative evidence in support of its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-movant's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52. "Where the defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment should be granted." *Mitchell*, 964 F.2d at 582.

A party responding to a summary judgment motion cannot rely on mere allegations but instead "*must* set forth *specific facts* showing that there is a genuine issue for trial." Fed. R. Civ. Pro. 56(e) (emphasis added). "It is well settled that the non-moving party must cite specific portions of the record in opposition to a motion for summary judgment, and that the court is not required to search the record for some piece of evidence which might stave off summary judgment." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997). The court "is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record

for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

III.

*Analysis*

As noted, Cline brings his retaliation and age discrimination claims solely under the THRA. The THRA, *inter alia*, prohibits age-based employment discrimination and retaliation against persons who are at least forty years of age. TENN. CODE ANN. §§ 4-21-101(a)(3), (b), 4-21-301(1), 4-21-401(a)(1) (2005). THRA claims are analyzed under the same evidentiary framework used in evaluating federal Age Discrimination in Employment Act ("ADEA") cases. *See, e.g., Newsom v. Textron Aerostructures*, 924 S.W.2d 87, 96 n.12 (Tenn. Ct. App. 1995).

A number of legal and factual issues relate to some or all of Cline's claims. Before analyzing the claims individually, the court will first address these underlying issues.

A. <u>Abandoned Claims</u>[1]

In his response brief, Cline expressly abandons his failure-to-hire claims pertaining to the following jobs:

- ND Analyst, Req. No. 181887 (Two Positions)

- Quality Assurance Specialist, Req. No. 198178, Job No. M0305Y (Two Positions)

---

[1] In referring to the job postings at issue, the court will adopt the parties' convention of referring to the positions by either job title, requisition number, or job number.

- Construction QA Specialist, Req. No. 425 (One Position)

- Construction Welding Specialist, Req. No. 426 (One Position)

- Staff Engineer, Req. No. 649, Job No. 576 (One Position)

- Supervisor / Inspector II, Req. No. 895, Job No. 789 (One Position)

- Construction Subcontracts Administrator, Req. No. 1047, Job No. 917 (Two Positions)

- General Supervisor Materials I, Req. No. 1430 (One Position)

- QA Specialist, Req. No. 2002 (One Position)

Accordingly, and without the need for further discussion, summary judgment will be granted on these claims.

## B. Statute of Limitations

The THRA has a one-year statute of limitations.  *See Weber v. Moses*, 938 S.W.2d 387, 389-90 (Tenn. 1996).  A claimant must file suit no later than one year "after the alleged discriminatory practice ceases . . . ."  Tenn. Code. Ann. § 4-21-311(d) (2005).

Under what has been termed the "discovery rule," a statute of limitations commences to run "when the plaintiff knows *or in the exercise of reasonable care and diligence should know* that an injury has been sustained as a result of wrongful or tortious conduct by the defendant."  *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 143 (Tenn. 2001) (citation and quotation omitted) (emphasis added).  The courts of Tennessee apply the discovery rule in THRA employment cases.  *See id.* at 144 ("[T]he discovery rule applies to retaliatory discharge cases."); *see also Sevier v. Turner*, 742 F.2d 262, 272-73 (6th Cir. 1984)

(In Tennessee cases brought under federal civil rights laws, the statute of limitations begins to run when the plaintiff knows, or has reason to know through the exercise of reasonable diligence, of the injury that is the basis of his action.).

Cline argues, under two distinct theories, that the discovery rule should not apply in this case. Citing *Weber*, he first contends that the statute of limitations does not commence until a defendant has given "unequivocal notice" of its adverse action to the claimant. Cline is incorrect. Although timeliness in *Weber* was connected to the date of unequivocal notice, the holding (as in all discrimination actions) was fact-dependent. The Supreme Court has explained that employment discrimination cases "present widely varying circumstances," and statute of limitations analyses must be conducted on a case-by-case basis. *See Del. State Coll. v. Ricks*, 449 U.S. 250, 258 n.9 (1980).

In *Weber*, the employer gave notice of firing almost one month before the actual termination date. *See Weber*, 938 S.W.2d at 388. Weber brought suit within one year of his firing *but not* within one year of notice. *Id.* at 388-89. The complaint was thus time-barred because Weber did not file within one year *of the earlier of* the two events - "when the plaintiff received unequivocal oral notice of the decision to terminate his sales manager contract." *Id.* at 388, 391-93.

The *Weber* decision does not, as Cline now appears to argue, require "unequivocal notice" in all cases. The Supreme Court of Tennessee post-*Weber* has explained that "*Weber* . . . makes clear that the discovery rule applies to retaliatory discharge

7

cases." *Fahrner*, 48 S.W.3d at 144. Again, under the discovery rule, the clock begins to run either when actual notice is received or when the plaintiff should have known of his injury by exercising reasonable diligence - *whichever is earlier*.

Cline next contends that all of BWXT's challenged decisions should be connected as "continuing violations." This argument is also unavailing.

"The doctrine of continuing violations provides that a plaintiff may be granted relief for a time-barred act by linking a series of related acts, one or more of which falls within the limitations period." *Frazier v. Heritage Fed. Bank for Savings*, 955 S.W.2d 633, 637 (Tenn. Ct. App. 1997). The discovery rule does not apply in continuing violation cases. *See Booker v. Boeing Co.*, 188 S.W.3d 639, 649 (Tenn. 2006). "The inquiry is whether the earlier acts were related closely enough to constitute a continuing violation or were merely discrete, isolated, and completed acts which must be regarded as individual violations." *Frazier*, 955 S.W.2d at 638 (citation and quotations omitted). Courts should consider the following factors:

1. Subject matter - whether the alleged acts involve the same type of discrimination;

2. Frequency - whether the alleged acts were recurring (as in a regular paycheck) "or more in the nature of an isolated work assignment or employment decision"; and

3. Degree of permanence - whether the alleged acts had "the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?"

*Id.* (citation and quotation omitted).

The first of these factors weighs in Cline's favor, as the acts complained of are the same type of discrimination - failure to hire. However, the remaining factors dictate that this is not a "continuing violation" case. The challenged actions were not, like a paycheck, regularly recurring. Instead, they were "isolated . . . employment decision[s]." *See id.* Moreover, each bore an independent degree of permanence. Refusals to hire are discreet acts, each "a separate actionable unlawful employment practice," and they are "not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002) (quotation omitted).[2] Particularly in light of Cline's admission that he believed as early as December 2000 that BWXT was discriminating against him [Cline Dep. II at 95-97], this is simply not a case where "the plaintiff had no reason to believe he was a victim of discrimination until a series of adverse actions established a visible pattern of discriminatory treatment." *Frazier*, 955 S.W.2d at 638 (citation and quotation omitted).

Cline therefore cannot successfully invoke the continuing violation doctrine. The court will apply the discovery rule in deciding whether his claims are time-barred.

---

[2] Although the Supreme Court of Tennessee has not followed the *Morgan* decision on other grounds, it has also agreed with the *Morgan* view that an event such as a denial of a promotion is a discrete act. *See Booker*, 188 S.W.3d at 647-48.

## C. Section 3161 Certification

Section 3161 of the National Defense Authorization Act (presently codified at 50 U.S.C. § 2704(c)(2)) creates a DOE hiring preference for laid off workers. According to BWXT's staffing representative Emily Nunn, BWXT follows DOE's 1998 "[Oak Ridge Operations] Contractor Preference in Hiring Procedures" ("ORO Procedures"), which provides in material part that the § 3161 preference

> is not applicable when a contractor fills vacant positions through internal means, such as promotion or reassignment; it applies only to filling jobs through external new hires.
>
> . . .
>
> . . . Where a displaced employee with the hiring preference and other external candidates are considered to have approximately equal qualifications, preference should be given to the individual with the hiring preference.

[Nunn Dec., ¶ 11, ex. 2, p. 1, 4]. It is undisputed that Cline was eligible for the § 3161 preference throughout the relevant time period.

Cline argues that his § 3161 certification should have "set him apart," even regarding jobs that were open only to internal applicants. He has not, however, cited evidence that BWXT did not evenly follow the ORO Procedures pertaining to § 3161 or, that as a DOE contractor, BWXT was not required to do so. An employer is permitted to enforce a fair and consistently-applied hiring process. *See Williams v. Hevi-Duty Elec. Co.*, 819 F.2d 620, 629 (6th Cir. 1987).

Moreover, this court has previously addressed the argument now raised by Cline.

> Under the NDAA, the Secretary of Energy is required to establish a plan to restructure the workforce in defense nuclear facilities when a change in the workforce is required. *Oil, Chemical and Atomic Workers International Union, AFL-CIO v. Richardson*, 214 F.3d 1379, 1381 (D.C. Cir. 2000); 42 U.S.C. § 7274h(a). The "objectives" called for in § 3161 for use in establishing the restructuring plan allow for discretion by the Secretary. Employees terminated from such facilities are to be given preference in hiring by the Department of Energy "*to the extent practicable.*" 42 U.S.C. § 7274h(c)(2) (emphasis added). "Thus, the 'objectives' provided by Congress in § 3161 fall short of a guarantee of employment or hiring preferences." *Abeyta v. United States Department of Energy*, No. CIV. A. 96-Z-537, 1997 WL 473990, at *4 (W.D.Colo. Aug. 6, 1997).

*Moran v. Lockheed Martin Energy Sys., Inc.*, No. 3:99-CV-109, slip op. at 6 (E.D. Tenn. Feb. 26, 2002). The court accordingly rejects Cline's contentions: (a) that § 3161 entitled him to a preference over any *internal* applicant; or (b) that his § 3161 eligibility in any way guaranteed that he would be hired for an available position.

### D. Q-Clearance and Human Reliability Program

Q-clearance is "analogous to a 'top secret' clearance" from DOE. *Ensor v. Rust Eng'g Co.*, No. 89-5106, 1991 WL 93188, at *1 (6th Cir. June 4, 1991). An individual must have Q-clearance to work in "protected" areas of the "heavily fortified and guarded" Y-12 facility. *Id.* According to Ms. Alexander, possession of an active, current Q-clearance is of significant advantage to BWXT job applicants.

To obtain Q-clearance, an individual must undergo a thorough background investigation. *Ensor*, 1991 WL 93188, at *1. It normally takes two years or more to become

Q-cleared.  *O'Neal v. Wackenhut Servs., Inc.*, No. 3:03-CV-397, 2006 WL 1469348, at *8

(E.D. Tenn. 2006).   Additionally, according to Ms. Nunn, certain Y-12 jobs require

additional certification under the Human Reliability Program ("HRP").  *See* 10 C.F.R. §§

712.1 - 712.38.  HRP certification typically takes an additional year *after* Q-clearance is

obtained.  Applicants who are Q-cleared thus often have a two-year advantage over uncleared

applicants.   Persons  who  are  both  Q-cleared  and  HRP-certified  often  have  a  three-year

advantage.

        BWXT contends that Cline was deemed less qualified for many of the jobs at

issue because he was at all relevant times neither Q-cleared nor HRP-certified.  According

to the declaration of Diane Patterson, who works as a DOE Office of Safeguards and Security

and Emergency Management Chief, Cline has not possessed an active Q-clearance since

December 8, 2000.  In response, Cline by affidavit claims to have been continually Q-cleared

through the year 2006.  [Cline Aff., ¶ 16] ("After the termination of my [UT-Battelle]

employment . . . I remained Q-cleared through 2006[.]").  In addition to his affidavit, Cline

cites a January 2002 § 3161 certification form completed by him and signed by Ms. Nunn.

[Cline Aff., ex. 6].  In the "Classifications Held" section of that document, Cline noted that

among other qualifications he was "Q-cleared."[3]

---

[3] By her second declaration, Ms. Nunn states that her signature on § 3161 forms is intended
to certify only § 3161 eligibility - not any other qualification statements made by the applicant.
[Nunn Dec. 2d, ¶ 15].

Like any other non-movant, Cline cannot create a genuine issue of fact merely by filing an affidavit which contradicts his prior statements. *See Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). Regarding post-layoff Q-clearance, the evidence before the court shows the following:

1. A January 4, 2005 § 3161 form submitted by Cline states in material part, "Q-Clearance for 31 years until [12/01/2000] layoff." [Cline Aff., ex. 6].

2. A January 21, 2004 application cover letter signed by Cline states in part, "Currently USEC has applied for an update/reinstatement of my "Q" clearance. [Nunn Dec. 2d, ex. 2].

3. The resumes submitted by Cline for BWXT jobs 1481, 1586, and 1666 each state, "Department of Energy Q-Clearance 1969-2000." [Nunn Dec. 2d, ex. 2-4].

4. Cline testified that he interviewed with National Resource Management and was waiting for them since July 2003 "to apply for a Q clearance for me." [Cline Dep. at 183-84].

In light of these prior statements by Cline, there is no genuine issue of material fact regarding his post-layoff Q-clearance. Again, Cline cannot create an issue of fact merely by contradicting himself. *Reid*, 790 F.2d at 460. There is no material question that Cline did *not* hold a Q-clearance after December 8, 2000.

E. The Career Center

The Career Center was a DOE-funded placement office for laid off Oak Ridge workers. By November 2000, the Career Center was under the supervision of BWXT. The Career Center was managed by Ms. Nunn during the period 2000 through 2004. According to Ms. Alexander's deposition, the Career Center posted external job openings from various

Oak Ridge DOE sites and provided job search counseling. It was an applicant's responsibility to submit a resume to the appropriate staffing office, but the Career Center would submit resumes by fax if requested to do so by the applicant. [Alexander Dep. at 16-25].

By his affidavit, Cline states that he asked the Career Center to forward his resume regarding thirteen specified postings. [Cline Aff., ¶ 23]. Although BWXT argues that Cline submitted some applications through incorrect informal channels (or not at all), the court must at the summary judgment stage generally believe Cline's evidence. *Liberty Lobby,* 477 U.S. at 255.

Again, however, the court will not find a genuine issue of material fact based solely on a nonmovant's contradictory statements. *Reid*, 790 F.2d at 460. According to Cline's affidavit, he asked the Career Center to forward his application for the Senior Physical Testing Technician position. Conversely, in his earlier deposition, Cline admitted that he informally submitted his application through a friend even though he knew the job was not open to external applicants. [Cline Dep. II at 108-11]. Therefore, although the court must generally accept Cline's Career Center statement regarding application for the other specified jobs, *see Liberty Lobby*, the court cannot accept his assertion that he properly applied for the Senior Physical Testing Technician position. *Reid*, 790 F.2d at 460.

## F. Direct Evidence

At summary judgment, the court evaluates an ADEA claimant's inferential and circumstantial evidence using the familiar *McDonnell Douglas* burden-shifting approach.

*See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). However, "[w]hen proving

a claim through the use of direct evidence, a plaintiff does not have to proceed under the

*McDonnell Douglas* burden-shifting framework." *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th

Cir. 2004). "Direct evidence" is:

> that evidence which, if believed, *requires* the conclusion that unlawful
> discrimination was at least a motivating factor in the employer's actions.
> Consistent with this definition, direct evidence of discrimination *does not
> require* a factfinder to draw *any inferences* in order to conclude that the
> challenged employment action was motivated at least in part by prejudice
> against members of the protected group. [T]he evidence *must* establish not
> only that the plaintiff's employer was predisposed to discriminate on the basis
> of [age], but also that the employer acted on that predisposition.

*Id*. (citations and quotations omitted) (emphasis added).

 In its summary judgment brief, BWXT addresses three published statements

attributed to Susan Alexander (the Human Resources Director for a parent company of

BWXT), Dennis Ruddy (BWXT's president), and Steve Smith (BWXT's Human Resources

Manager).[4] Presuming that Cline would cite these statements as direct evidence of

discrimination, BWXT proactively endeavors to place the statements in context - either as

---

[4] Alexander was quoted in a 2002 BWXT newsletter as stating, "Our recruitment and hiring activities, along with our employee development initiatives, clearly support the revitalization of our workforce . . . ." [Alexander Dep. at 80-81]. Ruddy was quoted in a 2005 newspaper article as stating that Y-12 had gone from "dinosaur to dynamo" under his leadership. [Ruddy Dep., ex. 1]. Smith was quoted in a company newsletter as stating, "BWXT Y-12 is revitalizing the Y-12 work force . . . The company is keenly aware of the need to fill the pipeline with new college graduates to help meet our critical skills needs[.]" [Smith Dep. at 39].

references to facilities modernization or compliance with the Chiles Commission.[5]

Cline's summary judgment response regarding these three statements, *in its entirety*, is as follows:

---

[5]

In 1996 Congress ordered the Department of Energy to conduct an inquiry into whether the nuclear workforce was prepared to deal with the possibility that many of its experts might soon be retiring. Accordingly, the Department established the "Chiles Commission" to look into the problem. In 1998 this commission visited . . . Y-12 . . . . [LMES] reported to the Chiles Commission that 39% of the employees with "critical skills" in nuclear science and technology were in immediate danger to retire, and that a total of 78% would be eligible to retire within 10 years. . . .

. . .

. . . [T]he Chiles Commission . . . concluded that the nuclear industry was in danger of having a high percentage of its most important, highly skilled workers retire soon. The worry was not that older people were less capable than younger workers. On the contrary, the concern was that most of the workers with critical skills were eligible or nearly eligible for retirement, and that when those people retired the nuclear industry could potentially suffer dearly. . . .

*Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 546, 549 (6th Cir. 2004).

The Chiles Commission's report, dated February 11, 1999, concluded that at sites including Y-12 "DOE must take necessary actions to . . . accommodate the influx and rapid integration of new personnel required to maintain critical skills." [Alexander Dec., ex. 1 at 30]. According to Ms. Alexander:

The Chiles Commission report was important because it was the driving force behind how LMES, and subsequently BWXT, went about insuring that the critical skills would be transmitted to new employees, or in the words of the Chiles Commission, from one generation of workers to the next. The Chiles Commission directed DOE to direct its contractors to come up with a plan to insure that the technical knowledge of the retiring critical skills employees was not lost and was passed on to the new employees.

[*Id.* at ¶ 11].

> The Defendant at pages 15 and 16 of its Brief has mentioned some, but not all, of the age-bias statements of its managers. . . .
>
> . . .
>
> The Plaintiff . . . would submit that the age-related statements . . . cited in the Defendant's Brief speak for themselves.

[Doc. 41, p. 9, 38]. Clearly, Cline has made no effort whatsoever to relate these statements to any challenged employment action in this case, nor has he made any attempt to counter BWXT's explanations. *See* Fed. R. Civ. Pro. 56(e) (A party responding to a summary judgment motion "*must* set forth *specific facts* showing that there is a genuine issue for trial.") (emphasis added).[6] The statements at issue would require the court to mound inference upon inference. As such, they are not direct evidence of age bias.

---

[6]

> [I]t is the attorneys, not the judges, who have been present at the depositions; and it is the attorneys, not the judges, who have a professional and financial stake in case outcome. Thus, the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not. . . .
>
> Additionally, it seems to us utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion. Such a role would carry the court far beyond simply reviewing evidence in "the light most favorable to the non-moving party," or giving effect to inferences reasonably arising from the designated evidence.

*Guarino v. Brookfield Twp.Trs.*, 980 F.2d 399, 406 (6th Cir. 1992).

Cline also cites the affidavit of former BWXT employee Ronald Travis, who states,

> In March or April 2004, I attended an "all hands meeting" for the Engineering Department which was headed at that time by Pam Horning. Ms. Horning, the Head of Engineering at BWXT[,] announced at the meeting that there was a freeze on hiring within the Department except the Department would still be hiring "new college graduates" and a few "old salts" who had up to 15 years experience. These "old salts" probably would have been under 40 years of age. Ms. Horning had supervision over approximately 800 employees in this division.

[Travis Aff., ¶ 9]. Although Ms. Horning denies making such a statement, the court must of course accept Cline's evidence at this stage.

Nonetheless, Cline has not connected his "old salts" evidence to any of his individual claims. He does not, for example, show that Ms. Horning was a decisionmaker regarding any of his applications, or that he even applied for a job in the Engineering Department.[7]

Again, direct evidence does not require the factfinder to draw any inferences, *DiCarlo*, 358 F.3d at 415, nor does the summary judgment standard require a court to advocate a case on a nonmovant's behalf. *Guarino*, 980 F.2d at 406. Further, an isolated, remote, and ambiguous remark - such as the "old salts' comment - rarely constitutes direct

---

[7] It would be tempting to *infer* that Cline's Staff Engineer (Req. No. 175408) or Engineering Assistant III (Req. No. 244) applications pertained to the Engineering Department. However, the evidence shows that the Staff Engineer job was actually in David Monroe's Equipment Test & Inspection ("ET&I") Department [Monroe Dep. at 24], and the Engineering Assistant III position was in the "Assembly Organization." [Nunn Dec., ex. 19]. Moreover, each of these job postings closed more than two years before the "old salts" incident.

evidence. *See DiCarlo*, 358 F.3d at 416; *Brenner v. Textron Aerostructures*, 874 S.W.2d 579, 585-86 (Tenn. Ct. App. 1993). Cline's circumstances are not equivalent to those meeting the "direct evidence" standard in *DiCarlo*, where a supervisor with decision-making authority made comments, in close proximity to the plaintiff's termination, clearly disparaging age and national origin. *DiCarlo*, 358 F.3d at 416-18. Because the isolated, remote, and ambiguous "old salts" comment requires the heaping of inference upon inference, Cline has not established a *prima facie* case of discrimination through the use of direct evidence. *See id.* at 415; *see also Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 549 (6th Cir. 2004) (isolated "bring in some new blood" comment was not direct evidence of discrimination).

## G. Circumstantial Evidence

In *McDonnell Douglas* the Supreme Court established "the order and allocation of proof in a private, non-class action challenging employment discrimination[.]" *See McDonnell Douglas*, 411 U.S. at 800-03. Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 802. The elements necessary to make a *prima facie* showing will vary depending on the facts of each case and the type of discrimination alleged. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 575-76 (1978).

A *prima facie* case of discriminatory failure to hire requires that: (1) the plaintiff belonged to a protected class; (2) he applied and was qualified for a position for

which the employer was seeking applicants; (3) he was rejected; and (4) a significantly younger person was hired *or* the position remained open and the employer continued to seek applicants of the claimant's qualifications. *Easter v. Martin Marietta Energy Sys., Inc.*, 823 F. Supp. 489, 493 (E.D. Tenn. 1991); *Brenner*, 874 S.W.2d at 588-89. Although Cline characterizes his claim as "cumulative . . . and not based on any one particular job application" [Cline Dep. II at 138-39], a failure-to-hire plaintiff must establish a *prima facie* case as to each job he claims to have been discriminatorily denied. *See Messner v. Lockheed Martin Energy Sys., Inc.*, 126 F. Supp. 2d 502, 517 (E.D. Tenn. 2000).

To establish a *prima facie* claim of retaliation under the THRA, a claimant must show that: (1) he engaged in a protected activity; (2) the exercise of that right was known to the defendant; (3) the defendant subsequently took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Newsom v. Textron Aerostructures*, 924 S.W.2d 87, 96 (Tenn. Ct. App. 1995). A litigant's mere "belief" or "understanding" regarding the causal link does not create a genuine issue of material fact. *Id.* at 97. Instead, causal connection must be shown by direct evidence or by "compelling circumstantial evidence." *Austin v. Shelby County Gov't*, 3 S.W.3d 474, 480-81 (Tenn. Ct. App. 1999).

Plaintiffs bear the burden of persuasion throughout the entire process. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 793 (6th Cir. 2000). If the plaintiff is able to establish his *prima facie* case, the burden then shifts to the employer to "articulate

some legitimate, nondiscriminatory reason" for the adverse employment action. *Id*. at 792-93 (citation omitted). If the employer successfully provides such a reason, *McDonnell Douglas's* regime then places the final burden on the plaintiff to "demonstrate by competent evidence" that the employer's proffered reason is in fact merely a pretext. *McDonnell Douglas*, 411 U.S. at 805.

## H. Internal Job Postings

Some BWXT job openings are advertised only internally, while others are advertised both internally and externally. According to Ms. Nunn's declaration, under BWXT's procedures only current BWXT employees are allowed to apply for internal postings, and "[i]n all cases" qualified current BWXT workers are given preference over external candidates such as Cline. However, citing the hirings of Jeff Gardner, Ronald Travis, and Donald Cardwell, Cline contends that the "internal" preference was a sham procedure used to mask discrimination against him.

Gardner was hired as an ET&I Senior Inspector in late 2000 or early 2001. Gardner was at that time working at Y-12 but was not a BWXT employee. According to Monroe, Gardner was considered for this "internal only" posting because of three unsolicited recommendations, one of which was from a DOE representative who had recently worked with Gardner. [Monroe Dep. at 26-27, 38]. BWXT contends that, because it is a DOE contractor, "the views of DOE facility representatives carry considerable weight." Thus

Gardner, even though "external," was considered and eventually hired into one of the available Senior Inspector positions.[8]

As for Travis, his affidavit states that, "I was eventually hired but not for the position I bid on." [Travis Aff., ¶ 7]. Cline cites no further evidence on this issue, such as whether Travis was hired for an "internal" posting, nor does he offer any explanation whatsoever regarding Travis's relevance on this point, which the court deems waived.[9]

Lastly, Cline contends that "[t]he Defendant's practices and policies in every instance were construed against the Plaintiff, but not against Donald Cardwell," who was hired "off the street" without Q-clearance. Through the affidavit of John Stanley, the manager who hired Cardwell, BWXT explains why Cardwell was selected.

---

[8] Cline himself, at a 2003 deposition in his UT-Battelle lawsuit, has reported a similar version of the Gardner hiring.

Q. . . . How was it that Gardner got a job at Y-12, if you know? . . .

A. My understanding is that he knew – he had worked with a guy in DOE and inspection while he was doing some work at Y-12. . . . And the DOE representative over the inspection part from the DOE standpoint got acquainted with Jeff and thought Jeff was a good man, and he sort of escorted him through the process of getting employed.

[Cline Dep. *Baker* at 132].

[9] Assuming that BWXT did make some exception to its internal/external policy in Travis's favor, that fact would actually harm Cline's claims of age bias. According to his affidavit, Travis was born in approximately 1945 [Travis Aff., ¶¶ 6-8] and is essentially the same age as Cline. *See, e.g., Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003) (An age difference of six or fewer years is insignificant circumstantial evidence of discrimination.).

In the Spring of 2002, Carl Cardwell, Program Manager, and James Connor, Jr. ("Connor"), Deputy General Manager, approached me and asked me to consider Carl's son, Donald Cardwell, for a radiographer position. For brevity I will hereafter refer to them as Carl and Donald, respectively. As the Deputy General Manager, Connor was the second highest ranking manager at Y-12. As a Program Manager, Carl had influence over the budget for the Product Certification Department, including my section. I had recently promoted a radiographer to supervisor and had need of an additional radiographer. I told them I would take a look at Donald but that I could not make any promises.

. . . I interviewed him on June 26, 2002. I was impressed with Donald and ultimately decided to offer him the newly-approved radiographer position. While I found Donald to be qualified, I primarily offered him the job to accommodate James Connor's and Carl Cardwell's request that I consider him.

[Stanley Dec. 2d, ¶ 5-6] (emphasis added). Nepotism is not evidence of unlawful discrimination. *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1096 (6th Cir. 1996).

BWXT has produced evidence of nondiscriminatory reasons for its consideration of external candidates Gardner and Cardwell. Conversely, Cline has presented no competent evidence of pretext, either: (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the decision; or (3) that the proffered reasons were insufficient to motivate the decision. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Cline has accordingly failed to show that BWXT's internal hiring preference was a sham used to disguise age-based discrimination against him.

I. Senior Inspector, ET&I, Req. No. 175411, Job No. A0808Y (Seven Positions)

The court now turns its discussion to the remaining jobs that Cline claims to have been wrongfully denied. Four of the seven openings under Job No. A0808Y were

filled by January 2001, and the other three openings were transferred to another internal posting the following month. [Nunn Dec., ¶ 12, 13]. Cline's deposition testimony forecloses his claim regarding these seven jobs.

> Q. . . . At some point based on your complaint in this lawsuit, you've decided that because you didn't get an interview or offer with respect to any of these first seven positions that that was due to age discrimination, is that correct?
>
> A. That's correct.
>
> Q. When did it occur to you that you were being discriminated against because of your age?
>
> . . .
>
> A. That's when they hired Jeff Gardner and didn't hire me.
>
> . . .
>
> Q. That evidenced to you that you were not being selected for any of these seven positions because of your age?
>
> A. That's correct.

[Cline Dep. II at 95-97]. Cline admits knowledge of the adverse employment action as of Gardner's December 2000 hiring. Further, all hiring decisions under this requisition number were made no later than February 2001. Cline admittedly could have phoned BWXT's Human Relations Department to follow up on his applications but did not do so. [Cline Dep. II at 117].

Cline has failed to set forth any evidence showing that he could not have timely discovered these allegedly discriminatory failures to hire. *See Newsom*, 924 S.W.2d at 95.

"It is necessary to place a burden of reasonable inquiry/diligence upon [Cline] to prevent him . . . from 'sitting on his . . . rights.' Were we to hold otherwise, the limitations period for filing an ADEA charge of age discrimination would never commence until a plaintiff fortuitously learned" of the purported discrimination. *Id.*

Through the exercise of reasonable diligence, Cline should have known that he was not being hired under Job No. A0808Y more than one year before he filed suit on November 3, 2004. Thus, his claim is time-barred.

### J. Senior Inspector ET&I, Req. No. 175411, Job No. A0821Y (Three Positions)

These jobs were the reposting of the unfilled openings originally advertised under Job No. A0808Y. This posting was cancelled on October 10, 2001, with none of the positions filled. [Nunn Dec., ¶ 13].

Through the exercise of reasonable diligence, Cline should have known that he was not being hired under Job No. A0821Y more than one year before he filed suit. Thus, his claim is time-barred.

### K. Supervisor Inspection II ET&I, Req. No. 175414 (One Position)

BWXT promoted internal applicant John Harris effective May 1, 2001. [Nunn Dec., ¶ 14]. Through the exercise of reasonable diligence, Cline should have known that he was not being hired more than one year before he filed suit. His claim is time-barred.

L. <u>Staff Engineer, ET&I, Req. No. 175408, Job No. M0282Y (One Position)</u>

BWXT hired internal applicant Richard Sampson for this position effective March 1, 2001. [Nunn Dec., ¶ 15]. Through the exercise of reasonable diligence, Cline should have known that he was not being hired more than one year before he filed suit. Thus, his claim is time-barred.

In addition, Sampson was born in 1948. [Nunn Dec., ¶ 15]. Cline would therefore be unable to establish a *prima facie* case even if his claim was timely. *See Grosjean*, 349 F.3d at 340 (An age difference of six or fewer years is not significant).

M. <u>Supervisor Inspection II ET&I, Req. No. 156693 (One Position)</u>

This internal posting, which Cline does not address in his summary judgment response, was cancelled on April 3, 2001, and was never filled. [Nunn Dec., ¶ 16]. Through the exercise of reasonable diligence, Cline should have known that he was not being hired more than one year before he filed suit. His claim is time-barred.

N. <u>Senior Inspector / Senior Radiographer Technician, Req. No. 370, Job No. 140 (Three Positions), Req. No. 641, Job No. 569 (Four Positions)</u>

These seven openings were filled by internal applicants on or before April 12, 2002. [Nunn Dec., ¶ 20]. Through the exercise of reasonable diligence, Cline should have known that he was not being hired under either of these requisitions more than one year before he filed suit. His claim is time-barred.

O. Senior Physical Testing Technician, Req. No. 394 (Two Positions)

This internal posting was filled by two internal applicants (one of whom is only two years younger than Cline) in late 2001. [Nunn Dec., ¶ 21]. Through the exercise of reasonable diligence, Cline should have known that he was not being hired more than one year before he filed suit. His claim is time-barred.

P. Engineering Assistant III, Req. No. 244 (One Position)

This requisition was cancelled in September 2002. [Nunn Dec., ¶ 24]. Cline admittedly did not follow up with anyone regarding the status of his application. [Cline Dep. II at 127]. Cline cannot escape his duty of reasonable inquiry and diligence. *Newsom*, 924 S.W.2d at 95. This claim is time-barred.

Q. Chemical Operator, Req. No. 163817 (Forty-One Positions)

More than 500 persons, including Cline, applied for the 41 Chemical Operator positions under Req. No. 163817. The uncontroverted evidence before the court is that the last hiring decision under this requisition was made on August 13, 2002 - even though most of the successful applicants did not actually begin work until they obtained Q-clearance. [Nunn Dec., ¶ 25; Nunn Dec. 2d, ex. 5]. Cline admittedly did not follow up with anyone regarding the status of his application. [Cline Dep. II at 130]. Through the exercise of reasonable diligence, Cline should have known that he was not being hired under Req. No. 163817 more than one year before he filed suit. His claim is time-barred.[10]

---

[10] By his affidavit, Cline states that "I applied for one of the chemical operator positions . (continued...)

Eleven other Chemical Operator positions - for work in a different Y-12 department - were advertised under Req. No. 197511. [Nunn Dec. 2d, ¶ 10]. Cline's affidavit makes clear that he applied only for Req. No. 163817 and not for Req. No. 197511. [Cline Aff., ¶ 23]. He would therefore be unable to establish a *prima facie* case under Req. No. 197511. A claimant must actually *apply for* the position at issue, unless applying would be fruitless or unless the employee was not made aware of the position. *See Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145-46 (6th Cir. 1989). "With limited exceptions, one cannot establish that he was subject to an adverse hiring decision unless he makes his desire for the position known to the employer." *Id.* at 147. A "generalized expression of interest" is not enough, nor is a general "obvious desire" to be hired. *See id.*; *Williams v. Hevi-Duty Elec. Co.*, 819 F.2d 620, 629-30 (6th Cir. 1987).

Moreover, the uncontroverted evidence before the court is that the last hiring decision under Req. No. 197511 was made on May 23, 2002, even though most of the successful applicants did not actually begin work until they obtained Q-clearance. [Nunn Dec. 2d, ¶ 10-11, ex. 6]. Therefore, even if he had applied for these positions, Cline's claim would be time-barred.

---

[10](...continued)
. . and understood from talking with personnel of the Career Center and others that there would be a lot of hiring for these positions for a long time . . . ." [Cline Aff., ¶ 42]. This imprecise ("a long time") and inadmissible hearsay does not excuse Cline's duty of diligent inquiry. *See* Fed. R. Civ. Pro. 56(e) (a nonmovant cannot rely on evidence that is not admissible); *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (same).

R. Technical Specialist / Radiological Control Technology ("Rad Con Tech"), Req. No. 1481 (Seven Positions)

These seven positions were filled by hiring DOE-subcontractor certified technicians, one of whom was only a year younger than Cline, in June through August 2004. [Nunn Dec., ¶ 36]. Desired qualifications for this job included relevant experience, "A.S. or higher degree in a technical field and . . . DOE RCT standardized CORE training certification." [Nunn Dec., ex. 29]. The resumes of those hired reflect some combination of these qualifications, whereas Cline's application was deemed by a BWXT representative to "not meet minimum requirements for the position." [Nunn Dec., ex. 32-33].

Cline submitted his Rad Con Tech application in January 2004. [Nunn Dec., ¶ 35]. He did not obtain a CORE training certificate until April 2004, and Cline cites no evidence that he updated his application to reflect that fact. [Cline Dep. at 97]. Cline admittedly has no experience in radiation control work, but purports to understand the theory and equipment involved. [Cline Dep. at 98-99]. As evidence of discrimination, Cline contends that he "was qualified to perform the work and younger persons were hired." [Doc. 41, p. 22].

Although the point is indeed questionable, the court will presume for summary judgment purposes that Cline was qualified for a Rad Con Tech position and that he has thus made out a *prima facie* case. *But see Messner*, 126 F. Supp. 2d at 514 ("An employee's evaluation of his own performance or qualifications is irrelevant as a matter of law."); *Brenner*, 874 S.W.2d at 589-90 (claimant unqualified based on job requirements and

testimony of hiring managers, despite his own contrary opinion). In response, BWXT has stated a nondiscriminatory reason for its decision - that it hired applicants who were more qualified through certification, education, and experience.

To show that BWXT's justification is pretext, Cline relies only on his statement that he "was qualified to perform the work and younger persons were hired." However, he has cited no evidence that the seven experienced, certified technicians hired were not in fact qualified or that his qualifications (despite having no hands-on experience) were substantially greater than theirs.

> [I]n the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former. In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.

*Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006), *cert. denied*, 75 U.S.L.W. 3457 (U.S. Apr. 23, 2007) (No. 06-1145). Therefore, even if the court were to assume that Cline's qualifications were approximately equal to those of the successful Rad Con Tech applicants, that fact standing alone cannot establish pretext. *Id.* Summary judgment will be granted on this claim.

### S. Quality Assurance Analyst, Req. No. 1389 (One Position)

This listing generated 74 applications, including Cline's. [Nunn Dec., ¶ 37]. The requisition was cancelled in August 2005 and remains unfilled. [Nunn Dec., ¶ 37]. It

required a "[b]achelor's degree in a Quality Assurance, Business Administration, or related field plus 2-3 years of experience . . . ." [Nunn Dec., ex. 34].

Cline does not address the Quality Assurance Analyst position in his summary judgment response. The court agrees with BWXT's argument that Cline cannot make out a *prima facie* case because he was not qualified for this job. He has no degree and he cites no evidence indicating that he was otherwise qualified. Summary judgment will be granted on this claim.

### T. Technical Specialist / Survey Party Leader, Req. No. 1586, Job No. 1317 (One Position)

This posting required an "A.S. or higher degree in a technical field related to civil engineering/surveying and 3-4 years of relevant experience or high school with 6-8 years relevant experience." [Nunn Dec., ex. 35]. Job responsibilities included "[d]irect[ing] the work or a field survey party . . . ." [Nunn Dec., ex. 35]. The successful applicant possessed a civil engineering degree and had experience in directing survey parties. [Nunn Dec., ¶ 38].

Cline does not address this position in his summary judgment response. The court agrees with BWXT's argument that Cline cannot make out a *prima facie* case because he was not qualified. Cline has no degree and admittedly possesses no surveying experience. [Cline Dep. II at 158-60]. Summary judgment will be granted on this claim.

U. Technical Specialist / Inspection Technology, Req. No. 1666 (Five Positions)

The specific job duties listed for this internal/external posting included use of industrial radiography equipment. Eventual Q-clearance was required. [Nunn Dec., ex. 37]. Interviews took place in August and October 2004. [Nunn Dec., ¶ 39]. Cline did not receive an interview. According to the deposition of hiring manager John Stanley, external interviewees were selected based on a combination of experience, Q-clearance, and/or possible participation in BWXT's "college program." [Stanley Dep. at 18-21].

Although Cline possessed the desired radiography certification, his resume did not reflect that fact. [Cline Dep. II at 105]. The resume indicated supervisory experience in radiography [Stanley Dec. 2d, ex. 1], but Cline testified that he has performed no hands-on radiological testing. [Cline Dep. at 82]. The resume Cline submitted for Req. No. 1666 indicated that he was not Q-cleared. [Stanley Dec. 2d, ex. 1].[11]

Andrea Zava, the Product Manager of the Product Certification Department, placed Req. No. 1666 on hold on October 28, 2004 (or within a week thereafter), for budgetary reasons. [Nunn Dec., ¶ 40]. The hold was lifted a year later, but for internal posting only. [Nunn Dec., ¶ 40]. Three internal Rad Con Techs were hired. [Stanley Dec., ¶ 4]. Each possessed active Q-clearance and HRP certification. [Nunn Dec., ¶ 40; Stanley Dec., ¶ 4].

---

[11] Although Cline argues that he should have been interviewed for Req. No. 1666 because he "had an active Q-Clearance" [doc. 41, p. 23], the court has already found this assertion to be utterly false.

Although his resume indicated no radiography certification or Q-clearance, the court will assume *arguendo* that Cline was qualified for Req. No. 1666, to the extent that it was initially open to external applicants. In response, BWXT has stated nondiscriminatory reason for its decisions:

1. External applicants were selected for interviews based on some combination of relevant characteristics which Cline's resume indicated he did not possess;

2. The initial posting was placed on hold for budgetary reasons; and

3. The internal applicants who were eventually hired were more qualified via their Rad Con Tech experience, their active Q-clearance, and their HRP certification.

To show that BWXT's justifications are pretext, Cline again relies on the theory that he "was qualified to perform the work and younger persons were hired." Cline cites a portion of Stanley's deposition testimony to suggest that virtually all interviewees lacked Cline's radiography experience. [Stanley Dep. at 23-24]. However, the cited testimony pertained to Stanley's evaluation of a summary of Cline's experience that was prepared by Cline in conjunction with this lawsuit. [Stanley Dep. at 21]. This exchange bears no relevance to Stanley's prior decision-making (when he was presented only with Cline's resume). This, along with Cline's other scattered and undeveloped arguments pertaining to Req. No. 1666, does not demonstrate that BWXT's above-cited justifications were pretextual.

Cline has not shown that his presented qualifications were "so significantly better than" those of the successful applicants. *Bender*, 455 F.3d at 627. A claimant may not

establish pretext merely by questioning the soundness of an employer's business decision. *See Wilkins v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir. 1986). Summary judgment will be granted on this claim.

## V. Retaliation

Lastly, Cline alleges that BWXT retaliated against him for filing his UT-Battelle EEOC charge and subsequent lawsuit, complaining to the offices of his congressional representatives, and filing the present lawsuit. The court first notes that many of Cline's retaliation claims, as they pertain to failures to hire, are time-barred for the reasons previously discussed. Further, regarding those applications that are not time-barred, Cline admittedly has no evidence that any decisionmaker knew of his first lawsuit, his EEOC charge, or his letters to congressional representatives, or that there was a causal connection between any protected activity and the failures to hire. [Cline Dep. at 109-28]. Cline is accordingly unable to establish two elements of his *prima facie* case. *See Newsom v. Textron Aerostructures*, 924 S.W.2d 87, 96 (Tenn. Ct. App. 1995) (requiring knowledge and a causal connection).

To establish a *prima facie* claim of retaliation under the THRA, a claimant must show: (1) that he engaged in a protected activity; (2) that the exercise of that right was known to the defendant; (3) that the defendant subsequently took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse action. *Id.* Cline's mere "belie[f] and . . . conten[tion] that they did

retaliate against me" [Cline Dep. at 114] does not create a genuine issue of material fact as to the requisite link. *Id.* at 97. Instead, causal connection must be shown by direct evidence or by "compelling circumstantial evidence." *Austin v. Shelby County Gov't*, 3 S.W.3d 474, 480-81 (Tenn. Ct. App. 1999); *see also Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999) ("[A] plaintiff cannot establish causation by testifying that [he] cannot think of any other reason for" the adverse employment action.).

Only Req. No. 1666 involved a decision after the instant suit was filed. This job was put on hold for budgetary reasons either October 28, 2004, or within a week thereafter. The uncontroverted evidence shows that cancelling a post or placing it on hold is common at Y-12. [Nunn Dep. II at 29]. Cline has offered no direct or compelling circumstantial proof that, at the time Req. No. 1666 was put on hold, any decisionmaker knew about his current lawsuit, which was not served until November 15, 2004. Similarly, while BWXT does not contest that Stanley had knowledge of the present suit when he made the eventual 1666 hiring decision in October 2005, Cline has presented no direct or compelling circumstantial proof to causally connect that knowledge to Stanley's decision to hire three qualified, experienced, Q-cleared, HRP-certified, internal applicants rather than Cline.

Lastly, Cline contends that BWXT retaliated by not utilizing him as an ultrasonics training subcontractor. Ralph Mack, of BWXT's Development Division, considered Cline for that training position. [Mack Dep. at 5, 33, 35-36]. However,

according to Mr. Mack, following a meeting that he attended with Ms. Zava in approximately

October 2005,

> as we were leaving her office, you know, we was giving her an update of what
> we were planning on doing. And we mentioned to her, that Mr. Cline was the
> person that we were considering to do the training. And at that point she
> mentioned that we were in litigation with Mr. Cline and that he may not be the
> best person to do the training because of the litigation factor. So at that point
> . . . I said, "Okay. I'm going to have to table this."

[Mack Dep. at 39].[12]

BWXT concedes that this decision constituted an adverse employment action.

At first blush, it would therefore appear that Cline has made out a *prima facie* case of

retaliation, as Mack's testimony suggests knowledge of protected activity and a causal

connection. Upon closer inspection, however, the court concludes that Cline fails to establish

his *prima facie* case.

Mack's testimony does not show that he had any knowledge *of the substance*

*of Cline's present suit*, which could easily be - for example - a contract dispute or a personal

injury case. Cline also has not presented any proof that Ms. Zava knew the substance of the

present litigation. His counsel questioned Ms. Zava at length on this issue at her deposition,

beginning with reference to a conversation between Stanley and Ms. Zava which apparently

took place on January 18, 2005. [Stanley Dec. 2d, ¶ 8].

---

[12] Ms. Zava supervised John Stanley [Zava Dep. at 71] who in turn supervised Mack. [Mack Dep. at 7]. There is no allegation that Ms. Zava was involved in the October 2005 Req. No. 1666 hiring decision.

Q. At some point you became aware that Mr. Cline had a lawsuit; is that correct?

A. Yes.

Q. How did you become aware of that?

A. John Stanley indicated to me that he was going to talk to the lawyers with regard to a lawsuit just as a supervisor/employee.

. . .

Q. What did [Stanley] say about Mr. Cline, about why it was necessary for him to give a deposition?

A. He didn't say.

Q. Were you not a little curious as to what types of charges that Mr. Cline was making that would bring Mr. – your employee, I guess, Mr. Stanley, into the mix?

A. Well, he had indicated that he wasn't supposed to talk about it much, so I didn't question him. I determined that if I was involved or needed to be involved that I would be.

[Zava Dep. at 68-71]. Ms. Zava's uncontroverted declaration similarly provides that

The first time I became aware of the basis of [Cline's] case was when I met with BWXT counsel on June 14, 2006. . . . I became aware sometime in early 2005 that Cline was in litigation with BWXT from Stanley in the manner I described in my deposition. I had no knowledge at that time or until June 14, 2006, that his litigation had anything to do with employment or employment discrimination.

[Zava Dec., ¶ 4].

The court finds no genuine issue of material fact as to Mack's and Ms. Zava's

lack of knowledge regarding the basis of the present lawsuit. Because Cline has not shown

a decisionmaker's knowledge of his exercise of a right protected by the THRA, he cannot make out a *prima facie* case of retaliation regarding the training subcontractor position. Summary judgment will be granted on his retaliation claim.

An order reflecting this opinion will be entered.

ENTER:


_____s/ Leon Jordan_____
United States District Judge